*Exhibit A*

1       <u>TRANSCRIBED FROM DIGITAL RECORDING</u>

2              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION
                                        )
4       UNITED STATES OF AMERICA,        )
                                        )
5                       Plaintiff,       )  Case No. 19 CR 692
                                        )
6       -vs-                             )  Chicago, Illinois
                                        )  September 18, 2019
7       JESSICA NESBITT,                 )  2:23 p.m.
                                        )
8                       Defendant.       )

9    TRANSCRIPT OF PROCEEDINGS - Initial Appearance and Arraignment
        BEFORE THE HONORABLE MARIA VALDEZ, MAGISTRATE JUDGE
10
     APPEARANCES:
11
     For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
12                             UNITED STATES ATTORNEY
                               BY:  MR. DEVLIN N. SU
13                             Assistant United States Attorney
                               219 South Dearborn Street, 5th Floor
14                             Chicago, Illinois 60604

15
     For the Defendant:        MR. BARRY D. SHEPPARD
16                             180 North LaSalle Street
                               Suite 2510
17                             Chicago, Illinois 60601

18   Also Present:             MS. CARLA TRAMONTE, US Pretrial
                               Services
19
          **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
20           NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
               PORTIONS UNINTELLIGIBLE AND INAUDIBLE.
21
     Transcriber:
22                     SANDRA M. MULLIN, CSR, RMR, FCRR
                          Official Court Reporter
23                       United States District Court
                   219 South Dearborn Street, Suite 2260
24                       Chicago, Illinois  60604
                       Telephone:  (312) 554-8244
25                    Sandra_Mullin@ilnd.uscourts.gov

1    (Proceedings heard in open court:)

2         THE CLERK:  Case 19 CR 692, United States of America

3    versus Suppressed, Initial Appearance and Arraignment Hearing.

4         MR. SU:  Good afternoon, your Honor.  Devlin Su for

5    the United States.

6         MR. SHEPPARD: Good afternoon, Judge.  Barry Sheppard,

7    appearing on behalf of Jessica Nesbitt.  Seek leave of court to

8    file my firm's appearance.

9         THE COURT:  Ms. Nesbitt is present in court.  We also

10   have?

11        PRETRIAL SERVICES OFFICER:  Pretrial Services.  Your

12   Honor, good afternoon.  Carla Tramonte.

13        THE COURT:  All right.  Good afternoon to everyone.

14   We're here for Ms. Nesbitt's initial appearance and

15   arraignment. Mr. Sheppard, do you have a copy of the

16   indictment?

17        MR. SHEPPARD:  I do, your Honor.

18        THE COURT:  Would you like to waive formal reading?

19        MR. SHEPPARD:  So waived, your Honor, yes.  There

20   will be, at this time, a plea of not guilty, subject to formal

21   arraignment.

22        THE COURT:  All right.  The plea of not guilty to all

23   counts of the indictment will be noted.  Let me have the

24   government advise Ms. Nesbitt of the maximum possible

25   penalties.

1      MR. SU:  Your Honor, Count 1 carries a maximum

2  penalty of five years in prison, $250,000 fine, a term of

3  supervised release of two to three years.

4      Counts 2 through 8 each carry a maximum penalty of

5  five years in prison, a $250,000 fine, and two to three years

6  of supervised release.

7      Count 9 carries a maximum penalty of 20 years in

8  prison, a $250,000 fine, two to three years of supervised

9  release.

10      Count 10 carries a maximum penalty of ten years in

11  prison, $250,000 fine, two to three years of supervised

12  release.

13      Counts 11 through 13 carry a maximum penalty of ten

14  years in prison, a $500,000 fine, and two to three years of

15  supervised release.

16      In addition, all 13 counts each carry a mandatory

17  $100 special assessment.  And there is a forfeiture allegation

18  contained in the indictment, requiring forfeiture of the assets

19  identified in the indictment on her guilty conviction.

20      THE COURT:  Ms. Nesbitt, do you -- you have a copy of

21  the indictment through your counsel.  Do you understand the

22  maximum possible penalties to the 13 counts?

23      THE DEFENDANT:  Yes.

24      THE COURT:  All right.  Let me advise you of your

25  rights.  You have the right to remain silent.  You are not

1      required to make any statements.  If you choose to make a

2      statement, you can stop at any time.  You must remember that

3      any statement you make can be used against you.  Do you

4      understand this?

5                    THE DEFENDANT:  Yes.

6                    THE COURT:  You have the right to have an attorney

7      represent you throughout all phases of this criminal

8      proceeding.  If for any reason you cannot afford an attorney,

9      you need to make an application to the court.  And if the court

10     finds you're entitled to appointed counsel, we will appoint an

11     attorney free of charge.  The important point is you are

12     entitled to counsel, whether or not you can afford it.  Do you

13     understand this?

14                   THE DEFENDANT:  Yes.

15                   THE COURT:  All right. She has been advised of her

16     rights, and she indicates that she understands her rights.

17                   What is the government's position on bond?

18                   MR. SU:  Your Honor, we are proposing a $250,000

19     unsecured bond.  We have conditions of -- proposed conditions

20     of release worked up.  I believe there is a dispute over how

21     restrictive her, I guess, freedom of movement should be.   In

22     the government's position is that she should be placed under

23     home incarceration.  I understand defendant's counsel is

24     objecting to that particular condition.

25                   THE COURT:  Is that the only condition that's being

1    objected to at this time?

2            MR. SHEPPARD:  Yes, your Honor.

3            THE COURT:  And from pretrial services' perspective,

4    has there been a background check in any way?

5            PRETRIAL SERVICES OFFICER:  Yes, your Honor.

6            MR. SU:  And, your Honor, I can go into our rationale

7    behind our position now, if you'd like.

8            THE COURT:  Let me just get some further

9    information --

10           MR. SU:  Absolutely.

11           THE COURT:  -- from pretrial, and then I'll hear from

12   you, Mr. Su.

13           PRETRIAL SERVICES OFFICER:  Your Honor, there was one

14   prior arrest in 2011, of promoting prostitution, which she

15   received three years conditional discharge.

16           MR. SHEPPARD:  May I interrupt on that one aspect,

17   Judge?  The --

18           THE COURT:  Give me a moment.  Let me just finish up

19   with our officer here.

20           MR. SHEPPARD:  I wanted to correct that, though.

21           THE COURT:  I'm going to give you a chance to do

22   whatever you need to do, but I've got to get further

23   information.  Is there anything further?

24           PRETRIAL SERVICES OFFICER:  Yes, your Honor.  Just

25   for the court's information, there is a valid FOID card issued,

1    and it's active.  But she reports it's in her residence.

2              THE COURT:  And any passports?

3              PRETRIAL SERVICES OFFICER:  There is a passport.  And

4    may I also add, your Honor, she has two firearms in the

5    residence that we would like to have removed.

6              THE COURT:  Okay.  Anything else?

7              All right.  Now I'll hear any factual objections to

8    the information that has been conveyed by pretrial services.

9              MR. SHEPPARD:  Thank you, your Honor.  We are privy

10   to the arrest.  The -- there was a two-year period of

11   conditional discharge on a reduced offense of disorderly

12   conduct.

13             THE COURT:  So that's not an objection, you just have

14   an explanation.  Is that what's going on right now?

15             MR. SHEPPARD:  That's correct.

16             THE COURT:  Okay.  So I'll give you a chance after

17   the government makes their formal presentation.  Then you go

18   second.

19             MR. SHEPPARD:  Okay.

20             THE COURT: All right.  Go ahead, Mr. Su.

21             MR. SU:  So, your Honor, our request for home

22   incarceration is based on the noncompliance -- defendant's

23   noncompliance with the law during this investigation.  And by

24   way of background, I think your Honor can glean from the

25   indictment that this is an investigation into the defendant's

1    operation of a house of prostitution called the Kink

2    Extraordinaires, or KE, which operated at a residential

3    neighborhood in the 2400-block of West Augusta Boulevard in

4    Chicago.

5          We've been investigating this for some time, and this

6    investigation became overt in January of 2017, when we executed

7    search warrants, both at the defendant's residence, as well as

8    the KE building at Augusta.  At that point, she certainly knew

9    that there was a federal investigation into her and her illegal

10   activities.  Immediately thereafter, we began speaking to

11   former employees who quit the business after that search in

12   January 2017.  They told us in the ensuing months that Nesbitt

13   immediately reopened that business to clients, specifically

14   stating that because the government had taken credit card

15   terminals as well as computers used to book appointments

16   electronically, that Nesbitt told her clients that she could

17   only take cash, and then she started taking and making these

18   appointments by hand on paper, rather than electronically.

19         Fast forward to earlier this -- earlier this summer

20   and after this grand jury indictment was returned, we resumed

21   conducting surveillance at the business.  And I'm going to walk

22   through several instances of surveillance that indicated that

23   this business was actually still operational.

24         In August of 20 -- August 23rd of 2019, FBI observed

25   multiple adult males being buzzed into the building, including

1    one who entered with a bottle of champagne at about 9:30 in the
2    morning.

3           On September 3, 2019, surveillance observed multiple
4    adult males exiting the building through the front and as well
5    as the back garage door in the afternoon.

6           THE COURT:  Can you give me an indication of what the
7    building -- what kind of area is the building located?  Is it
8    residential?  Is it industrial?

9           MR. SU:  Your Honor, it's a residential neighborhood.
10   The building is a standard, I think, Chicago three-flat.  There
11   is three units in there, three residential units.  So from the
12   outside appearance, it looks like a regular apartment building,
13   but the investigation revealed it has been used for illegal
14   activity.

15          Getting back to the September 3rd, one of these adult
16   males was one customer who brought in two duffle bags.  He was
17   identified based on his car registration.  His name appears in
18   the seized electronic appointment software as personally
19   booking sexual activities, prostitution activities, at KE back
20   in 2016.

21          On September 13th, the defendant's car was scene
22   parked inside the garage at the KE building at about 2:30 in
23   the afternoon.  Later that same day, law enforcement checked
24   Gentleman's Pages, which is an adult services periodical
25   referenced in the indictment.  They observed the same

1  advertisement that's referenced in the indictment still posted
2  and active.  And we've reproduced a screen shot of that
3  advertisement in the folder of the exhibits that we handed to
4  your Honor.  Still contains the same sexually-charged language,
5  same sexually-charged photographs.  The defendant is personally
6  depicted on that advertisement, as are employees of KE who were
7  previously identified as employees during the life of the
8  conspiracy that we charged.

9  We also obtained, as reproduced also in that folder
10  that your Honor has, her current bank records.  Those indicate,
11  at least for this one account, that KE is now going by the
12  business name of Security (sic.) Management Enterprises.  These
13  are statements from August of 2019, indicating that the account
14  took in $34,000 in credit card deposits and wrote payroll
15  checks, about $17,680, to her employees that month, which is
16  the same pattern of financial activity that's referenced in the
17  indictment.  Some of those payroll recipients are the same
18  employees of the business we identified as providing
19  prostitution services to clients back in 2017.

20  And then, finally, this morning, we spoke to
21  individuals who were seen entering and leaving that same
22  building.  They said that they were maintenance men hired by
23  the defendants to work on various projects inside that
24  building.  One of them said that he had personally observed sex
25  toys in every single room in that building.

1    And so I think it's clear that, even after law

2  enforcement conducted a search warrant, even after she knew

3  that she was a target of, I think, a very serious federal law

4  enforcement investigation, she is continuing to conduct these

5  same illegal activities, which I think implies two things:  I

6  think, first, her resumption of business means that she is

7  earning income that we haven't seized.  As the indictment

8  reflects, we did seize numerous assets, but it seems that she

9  is now able to replenish at least some of those, meaning that

10  she has at least some resources to flee.

11    But second, I think, more importantly, our position

12  is that this resumption of the illegal activity shows that she

13  lacks respect for the law, and I don't think it bodes very well

14  for her respect for your Honor's release orders, for

15  supervision by pretrial.  And so we believe that a more

16  restrictive condition of home incarceration is appropriate on

17  her, given that she poses more of a supervision risk than your

18  average defendant.

19    THE COURT:  All right.  So the two group exhibits,

20  you want them part of the record, you want the court to

21  consider them in --

22    MR. SU:  Yes, your Honor.

23    THE COURT:  All right.

24    MR. SU:  And I've handed copies to the defense

25  counsel as well.

1        THE COURT: Mr. Sheppard, now you're up.

2        MR. SHEPPARD:  Thank you, your Honor.  Preliminarily,

3   I wanted to address that one issue that the pretrial assistant

4   referenced.  The case charging prostitution was dismissed

5   against my client several years ago, and the charge was -- to

6   which there was a negotiated plea on was disorderly conduct.

7   That was a period of conditional discharge on a misdemeanor

8   offense.  That offense has since been sealed, ordered sealed,

9   by the presiding judge's office of Cook County.  So with regard

10  to the -- any allegations of prostitution that -- those --

11  those are not accurate.  So simply the -- and then I have a

12  copy of the rap sheet.  The city --

13       THE COURT:  So the original charge was prostitution?

14       MR. SHEPPARD:  That's correct.

15       THE COURT:  There was a deal made for a two-year

16  conditional discharge of the original charge, and that would --

17  turned into a disorderly conduct.

18       MR. SHEPPARD:  That's correct.  That's accurate.  I

19  can show counsel, I have the rap sheet.

20       THE COURT:  I don't think there is any -- is there

21  any objection to that?

22       MR. SU:  No.

23       MR. SHEPPARD:  Okay.  So that's just with reference

24  to her previous background, and it says something about the

25  burden of proof in that case.  It says something about the --

1    the result was a, whatever it was, it was disorderly conduct.

2              So with that said, Judge, the defendant has been

3    operating a business, a fetish-based business.  Now, obviously

4    we're all mature adults here that -- and we can say the words

5    without recoiling.  That doesn't necessarily mean that there is

6    acts of prostitution being engaged.  And counsel said that

7    there was some hearsay which indicates that there was --

8    somebody saw sex toys.  Well, those aren't unlawful, your

9    Honor.  And there -- there is nothing that indicates to the

10   court that there was acts of sexual conduct having occurred

11   since the inception of this investigation.

12             Yes, she is -- has continued to conduct business, but

13   of course we all know that there is a presumption of innocence,

14   certainly, without any scintilla of evidence in a pre-charge

15   just because a search warrant was executed and somebody is

16   under investigation.  Investigations oftentimes don't culminate

17   in charges.  Now there has been charges.  Now there has been an

18   indictment.  It's -- there at least has been enough evidence

19   presented to the grand jury to establish probable cause, let's

20   say.

21             Prior to that, to hold the defendant to some type of

22   standard that she conducted some type of business while she was

23   being investigated, that doesn't seem quite fair.  And I think

24   it's against the intent of all the bail statutes.

25             THE COURT:  Well, you're not disagreeing that she

1  conducted some type of business, you're disagreeing that it was

2  illegal.

3           MR. SHEPPARD:  That's right.

4           THE COURT:  You're saying she conducted a business

5  which you believe to be legal, and the government is asserting

6  to be illegal.

7           MR. SHEPPARD:  That's exactly correct.

8           THE COURT:  And the grand jury asserted to be

9  illegal.

10           MR. SHEPPARD:  And we do believe -- and we've

11  conducted extensive investigation ourselves and research.  And

12  we believe that the -- there are serious burden of proof issues

13  for the government to meet in this type of case.  Fetishes are

14  legal.  Sometimes they're embarrassing, but they're legal.

15           THE COURT:  Well, not all fetishes would be legal;

16  correct?

17           MR. SHEPPARD:  Well, if there is not involved in any

18  type of unlawful touching or penetration.

19           THE COURT:  Well, you're saying unless it's legal --

20  unless it is, obviously, illegal, it's legal.  You're right,

21  there are some fetishes, my guess would be, that would be

22  entirely legal.  But there are also some that would be illegal.

23           MR. SHEPPARD:  Our position is that her involvement

24  was restricted to legal fetishes.

25           THE COURT:  Okay.

1          MR. SHEPPARD:  And if that were the case, and if it

2     were, and, of course, this involves testimony and evidence.

3     And just for the government to float it up before the court

4     doesn't prove anything.  It just is a lawyer, or investigator,

5     suggesting that this is their belief.  So our belief is

6     contrary to that.

7          So with that said -- and the only reason I even

8     address this is of no disrespect to the government

9     investigation or the government attorney at all, just, simply

10    because I don't think the defendant should be punished by

11    conducting affairs which she believes are legal.  And if they

12    were non-illegal, but they weren't acts of prostitution, put it

13    the other way, then they would be legal.  Regardless how

14    embarrassing and how cutting edge they may have been.  Listen,

15    I know the court has seen these pictures of women in

16    provocative poses and the word "kink" used.  There is -- there

17    is no actual pornography displayed, to the best that I can see.

18    These are clothed women in tops and bottoms.  Certainly

19    nothing -- no allegation whatsoever of under-age females

20    involved in this, any type of child pornography, not even

21    suggested by any of the evidence.

22         The -- I suppose what I'm suggesting to the court is

23    that this case should be viewed like all other cases.  The

24    government is willing to agree to an unsecured bond from the

25    defendant to come to court.  And, by the way, here she is in

1    court.  When counsel, not Mr. Su, but his colleague informed my
2    law partner this morning that an indictment had come down, it
3    was agreed that she be permitted to self-surrender.  We met
4    with the FBI agent today, Mr. Jewell, who is present in court.
5    We drove in to -- at separate times, but we met there.  She was
6    processed.  We then drove from there to the marshal's office,
7    the 24th floor.  There is not even a small suggestion of flight
8    in this case.  Quite the contrary.

9            My client has traveled.  She has a 13-year son.  So
10   she has taken her son -- she is a single mom, with a
11   13-year-old son, and she has traveled to faraway places.  She
12   was at the Galapagos Islands on a sightseeing turtles and type
13   of exotic wildlife there.  Recently she has made several trips
14   abroad, which -- for recreation.  And she has come back.  So
15   she has known she has been under investigation for the last two
16   years since the search warrant was issued.  And I want to be
17   precise about this because I have the exact copy here.  We
18   received notification January 10th of 2017.  That's been over
19   two years.  There has been no effort to flee.

20           I think what the government attorney is telling you
21   can be looked at both ways.  She continued to go to work with a
22   presumption of innocence.  With no -- no grand jury indicting
23   her, no arrests having been made.  An investigation, a search
24   warrant having been executed, and no arrests made.  So should
25   somebody curl up and hide at that point or continue to go to

1    work?  Particularly, let's just say she is innocent because

2    that is the presumption.  I say, yes.  So the government says,

3    we don't want her to continue to do the work that she thought

4    she could do.  The court can order her not to engage in any

5    type of specific activity.  The bond statute, 3142,

6    Subsection 14, does say -- does grant the court authority to

7    address issues of possible flight and threats to public safety.

8    Your Honor, there has not been the slightest allegation that

9    anybody has ever been so much as injured at my client's place

10   of business.  She has zero threat to public safety.  And in

11   terms of flight, she is here.  There is zero risk -- I believe

12   zero risk of flight.  I don't think the government can point to

13   any movement which would indicate that she is trying to

14   establish a residence anywhere other than where she lives,

15   right here in Chicago.

16            Her son is going to Lane Tech High School.  She is

17   scheduled to participate in open houses.  I'm going to read

18   from the text she sent me:  High school enrollment just began.

19   We are scheduled with several open houses over the next

20   month-and-a-half.

21            And I want my client's permission to reference these.

22            THE DEFENDANT: Uh-huh.

23            MR. SHEPPARD:  And have scheduled selective

24   enrollment testing.  She chaperones field trips at his school

25   and assists in fundraisers.  She personally drives her son to

1 school every day and picks him up.  And he is currently -- he

2 is going to be going to Lane Tech.  But the name of the --

3    THE DEFENDANT:  We have to apply to multiple

4 different high schools.  So we have a month-and-a-half for

5 enrollment.

6    MR. SHEPPARD: And the grade school is?

7    THE DEFENDANT:  He currently goes to the Coonley

8 Regional Gifted Center.  He is in a class where he learns two

9 grade-level advanced.  So it's very hands-on.

10    MR. SHEPPARD:  Okay.  So she is a single mom.  The

11 father is not involved in the life at all.  To lock her down

12 all day where she can't do mom things is onerous, your Honor,

13 and isn't related to any valid prosecutorial or judicial goal.

14 I know the goal is to secure a defendant's appearance.  She is

15 here, standing before you.  She has conducted herself in a

16 dignified manner in the face of 30 agents coming into her home

17 seizing a lot of her funds.  She has had assets seized.  We

18 filed on those assets.  So this isn't like there is a shameful

19 attempt to just say, keep the money and go hide somewhere.  We

20 filed for relief on those assets in a civil manner.  We've

21 complied with everything that a person can possibly be expected

22 to comply with under our laws.  So, and, again, once we're

23 informed by the prosecutor, and we've requested the ability to

24 self-surrender and granted that.  There is -- I think the issue

25 of flight is a non-issue.

1     THE COURT:  Well, let me cut to the chase because

2  what the government has argued is that she has, in their view,

3  continued to engage in illegal activity.  And that Government's

4  Group Exhibit 1 and 2, they offer as evidence of that.  And you

5  are making the argument that it is legitimate business

6  activity, it is not illegal, criminal activity.

7     So let me ask you a question about the bank records.

8  The checks that are attached, what would you describe these

9  checks to reflect?

10    MR. SHEPPARD:  And, your Honor, I've just been handed

11 these as I walked in this room at five minutes to 2:00, so I

12 haven't had a chance to fully analyze each and every check.  If

13 I can -- if I can just suggest, and I don't want my client to

14 comment on these at this point because we haven't had a chance

15 to review those together, but -- and I am trying to determine

16 who these individuals -- if I can have just a moment?

17    THE COURT:  Yes, go ahead.

18    MR. SHEPPARD:  For instance, the check made out --

19 and I'm just staring at Page 1 of 9, to Darlene Munoz for

20 $3,000, I'm told that that's an employee of the business, and

21 it's payment.  So -- and I suppose some of these other girls

22 have received payment.  You might say the girls made a decent

23 amount of money, okay, that's -- that maybe means -- in some

24 law firms people make $3,000 on a check.  So I don't think it

25 means anything, actually.  So I know there is a lot of paper

1   here, but, you know, if the government was able to say to you,

2   here, she cashed all these checks, and, you know, we have

3   evidence that she cashed all these checks from customers and

4   didn't deposit the funds, that would be one kind of case.  She

5   is not charged on any tax evasion in this case.  She is charged

6   with, in some counts, depositing a lot of money.

7           I know she is charged with structuring, I understand

8   that part.  But she is charged with depositing a lot of cash,

9   actually, and paying taxes on it.  So whether it was --

10  structuring is obviously a burden of proof issue as well, and

11  it's -- to hold a payment to employees against somebody, I

12  frankly can't see how this -- in response to the court's

13  inquiry, I don't see where this in any way aids you in

14  determining whether she is a threat to the safety of the

15  community or a threat to non-appear.  So in terms of this --

16  these pictures --

17          THE COURT:  Well, let me go back to the checks

18  because --

19          MR. SHEPPARD:  Sure.

20          THE COURT:  -- if this is a business and these are

21  reflective of payroll to employees or independent contractors,

22  it is -- there is no indication that this is payroll.  There is

23  no withholding.  There is no, you know, indicia of an

24  employee-employer relationship.  And even if it was an

25  independent contractor situation, there is usually a lot more

1  than just a check.

2  MR. SHEPPARD:  Well, Judge --

3  THE COURT:  So that was my concern, is --

4  MR. SHEPPARD:  Understood.

5  THE COURT:  We're talking legitimacy of business and

6  whether or not -- you know, I wanted to give you a chance to

7  address that concern that the court had, in light of this

8  exhibit.

9  MR. SHEPPARD:  Thank you.  My immediate answer to you

10  would be independent contractor.  You said the words yourself.

11  THE COURT:  No, except you don't usually just have a

12  check to an independent contractor.

13  MR. SHEPPARD:  Well, I'm not so sure that's the case.

14  I don't know.  I'm sure there is some type of invoicing.  I'm

15  sure -- you have what the government is parsing out here as to

16  present to you.  Then obviously this isn't a trial, and so

17  there is nobody here for me to cross-examine.  But sometimes

18  independent contractors do get paid in a check.  If a lawyer

19  was to hire an expert witness, of course there is an invoice,

20  but then there is a check.

21  So -- okay.  I'm told, under information and belief,

22  that there is withholding, and it's reflected in the bank

23  account.  If that's your Honor's concern as to whether there

24  has been withholding paid, I'm informed that there has been

25  withholding paid.  But just simply solely because there is

1    checks issued to independent contractors and not traditional
2    payroll checks, I don't think that, respectfully, I understand
3    the court's question --
4              THE COURT:  But it has --
5              MR. SHEPPARD:  -- but I don't think it establishes
6    anything.
7              THE COURT:  It certainly establishes more than what
8    you're saying because, if this was truly an employer
9    relationship, then there would be a lot more than just this.
10   So that's why I had it in my mind.  But let me have the
11   government address that.
12             MR. SU:  Your Honor, in fairness, I do see a debit
13   out of this account to the Illinois Department of Revenue,
14   which I think indicates tax purposes.  But I will say that this
15   type of financial activity, in terms of taking in deposits,
16   credit cards, $34,000, and then paying these checks out to the
17   payroll employees is exactly what we've alleged in the
18   indictment.  It's exactly what we've seen throughout the
19   investigation.  I will say that these amounts seem fairly high
20   to me, your Honor.  And based on what we know about the
21   business, how they charged more for prostitution services and
22   less for strictly legal fetish sessions, I think this type --
23   these payments and the amount of these payments is consistent,
24   again, with the provision of illegal activity.
25             Going back to the first comment that counsel

1    mentioned about presence of sex toys being in the --

2              THE COURT:  Well, let me just address to you.  The

3    Illinois Department of Revenue that you're referencing, so we

4    can all be on the same page, would be the second page, really

5    the third page of information in the government's bank records,

6    group exhibit.

7              MR. SU:  That's right, your Honor.

8              THE COURT:  And it's for $396.

9              MR. SU:  That's correct.

10             THE COURT:  And so that is -- is an argument to

11   represent the taxes withheld for the individuals for the month?

12             MR. SU:  That's what it seems like to me, your Honor.

13   And, again, I want to be accurate and fair to the defendant.

14   But, you know, even in our investigation we saw that she was

15   withholding taxes at the same time that she was paying

16   employees for sexual activity and prostitution activity.

17             Getting back to the sex toys, your Honor, Illinois --

18   the Illinois Prostitution Statute expressly prohibits sexual

19   contact between an object and a person's genitals.  And so

20   there is -- obviously we don't have -- we didn't enter the

21   building today, so we didn't personally verify this.  But

22   coming from somebody who had absolutely no reason to lie to law

23   enforcement about what you saw, I think it is indicative that

24   there is sexual activity going on -- illegal sexual activity

25   still going on.

1      And, finally, with respect to Group Exhibit No. 1 --

2      THE COURT:  Let me just understand your argument.  So

3  the use of the implements that were purportedly seen in every

4  room, that in and of itself would mean prostitution under the

5  law?

6      MR. SU:  My understanding of the Illinois

7  Prostitution Statute, and we cited in the indictment, is that

8  it criminalizes contact between the genitals of one person and

9  an object.  And so I think there is no real -- there is no real

10  reason for those implements to be present, unless they're going

11  to be used.  And if they're going to be used, then that's

12  illegal.

13      With respect to the advertisement, your Honor, this

14  is the same copy.  And by copy I mean, you know, the

15  advertisement's language that's been used in this advertisement

16  as we saw during our investigation.  And it uses -- I mean,

17  obviously it's not going to come out and say, you know, we're

18  providing prostitution.  But it uses key words that we found to

19  be significant to imply that they're willing to provide sexual

20  activity, such as fantasy role play, sensual scenes.  Making

21  your fantasies a reality.  We are erotically accommodating.  I

22  mean, this is the same exact language that we saw back when we

23  were -- had much greater visibility into the operations of the

24  business.  And our evidence is that this was an advertisement

25  for prostitution services.

1          THE COURT:  All right.  Mr. Sheppard?

2          MR. SHEPPARD:  Judge, I understand that counsel's

3   opinion of the sex toy statute, although, you don't have

4   anything in writing on that, there are obviously incidents

5   where masturbation in the presence of another person is not

6   illegal.  So we're not here to try the case today, obviously.

7          So what I'm contesting before the court is an

8   overreaching restriction on the defendant's pretrial freedom.

9   To be precise, the Statute 3142 does require the court impose

10  the least restrictive set of conditions, not the most

11  restrictive conditions.  In this case what counsel is proposing

12  is, in my view, unduly restrictive.  And there is actually no

13  reason, other than it sounds like the government is trying to

14  be punitive based on the fact that the defendant continued to

15  operate a business while under investigation.  And they

16  basically said that to you.  That's their position.

17         THE COURT:  I want you to address what the government

18  is saying is, they're saying their understanding of the law,

19  and as articulated by the grand jury through the indictment, is

20  that all of the activities that you have described that have

21  been ongoing that you believe are legal in nature are believed

22  by the government and asserted by the grand jury to be at least

23  probable cause to be illegal in nature.

24         So the government is saying, she is -- you know, if I

25  let her -- let her out without the restriction they're

1   requesting, she is going to continue to engage in the illegal

2   conduct that forms the basis of the indictment.  And generally

3   that is a powerful argument to make.  For example, I'm not

4   equating the same thing, but if somebody is here on a drug

5   case, and if they say, you know, they've continued to engage in

6   the exact same kind of activity that is articulated in the

7   indictment, then that is a powerful piece of evidence for the

8   court to deal with on bond.  So that's the kind of argument

9   that the government is making here.

10          And you are saying it is just -- it is a legal

11  activity, and they're saying it's an illegal activity.  But

12  we're here in a court of law because the grand jury has found

13  probable cause to believe that a crime has been committed and

14  that Ms. Nesbitt is the one who committed the crime.

15          So now I have to deal with, do I let her continue the

16  activity that the grand jury has determined to be probable

17  cause to believe that a crime has been committed, or is there

18  something else that I can do to deal with that.  So it's time

19  to be creative.

20          MR. SHEPPARD:  I understand that.  I appreciate the

21  court's thinking outside the box in this case.  Your Honor,

22  there is also the possibility of, I don't know this to be the

23  case, that the women who work for Ms. Nesbitt may have been

24  acting without her knowledge.  That's a possibility.  And I

25  don't think there is any -- counsel has not proffered to any

1  incidents where my client personally engaged in acts of

2  prostitution since the commencement of this investigation.  So

3  the -- I guess it's -- there is a possibility of accountability

4  in the theory, I get that part.  So, in response to your

5  Honor's question, this is a source of income for my client.  So

6  I'm hesitant to --

7          THE COURT:  I do understand that, but, again, you

8  know, the government is making the assertion that, you know,

9  like the drug dealer, I can't just say, okay, this is how you

10 get your money, I better let you do that while you're on bond.

11 Again, not equating the two criminal -- alleged criminal

12 activities, but that is basically the argument that is before

13 me.  So the grand jury has found probable cause that the

14 activity that the government is asserting, she continues to

15 engage in.

16         MR. SHEPPARD:  But she hasn't violated any bond

17 restrictions --

18         THE COURT:  No.

19         MR. SHEPPARD:  -- up until today, this moment.

20         THE COURT:  It's about whether or not she is going to

21 abide by all laws.  And that's always a requirement for bond

22 purposes.

23         MR. SHEPPARD:  Of course.

24         THE COURT:  And if somebody is not -- isn't in

25 violation of any law, then I'm going to be concerned about that

1 and try to deal with that in the conditions of release.

2 MR. SHEPPARD: Of course. In every criminal case,

3 I've been practicing defense criminal law for 43 years, and

4 every single criminal case, one of the conditions of bond is

5 that they do not engage in criminality. So can that -- does

6 that mean --

7 THE COURT: And being a judge for 14 years dealing

8 with these issues in almost every case of which the alleged

9 activity is what is alleged being continued as activity, then I

10 don't let them engage in that. So I'm trying to figure out how

11 to deal with this situation.

12 MR. SHEPPARD: I understand that. But, your Honor,

13 if somebody were, to use your metaphor, engaged in drug

14 dealing, they don't necessarily get locked up or locked at home

15 during the course of the case. And even though there is a

16 probable cause finding by the grand jury, that is -- there has

17 now been some threshold --

18 THE COURT: Well, I will say, I do do that, if I

19 believe that they have engaged in the activity and that there

20 is a chance they're going to continue to engage it, yes --

21 MR. SHEPPARD: This is a little more of a --

22 THE COURT: -- it does -- it does affect the

23 conditions of release, obviously. So I -- no, you're -- the

24 dilemma that you have is, this is your client's bread and

25 butter. This is how she survives and supports her child. But

1  I have an argument that I can't ignore that this is exactly the

2  kind of activity that the grand jury has determined is there is

3  probable cause to believe that it's criminal in nature.  So I'm

4  open to what the government is saying.  I'm not shutting them

5  down.  But I'm trying to figure out, is there a way of having

6  some middle ground, and I'm not sure there is.  And I'm asking

7  you to be creative too.

8         MR. SHEPPARD:  Thank you.  I really appreciate that.

9  If I could just have a moment to confer with my client?

10        THE COURT:  Yes.

11        MR. SHEPPARD:  Thank you, your Honor.

12        THE COURT: Put the noise on, please.

13     (Recess taken.)

14        THE COURT: I'm back. The court has a -- I have to

15 leave at 3:20 for a meeting, so we need to get things moving.

16        MR. SHEPPARD:  I can suggest to the court a possible

17 middle ground.  That my client be ordered -- obviously ordered

18 not to -- in addition to the standard condition, not be

19 permitted to engage in any acts of prostitution.  And perhaps

20 she can be ordered not to have any client personal sessions

21 with any customers.  She owns the building, your Honor.  I

22 understand that an address restriction is a possibility.

23        THE COURT:  So what the court is willing to do is not

24 have her on incarceration, but to not have her engage in any

25 business activities of the type that she has, in fact,

1    described, what you consider to be the legal activities, which

2    is engaging in any fetish type of role playing, any physical

3    touching using implements for a sexual, you know, desire,

4    either from the employee or independent contractor and client.

5    So basically she is not going to be able to do even what she

6    had believed she was legally doing.  She can get a job at a

7    store, she can do other kinds of employment, but not the type

8    of activities that she describes as legal in nature.  I want to

9    make sure if that is clear to everybody.

10            MR. SHEPPARD:  That's fair enough.

11            THE COURT:  Is there any other dispute with respect

12   to the bond?

13            MR. SU:  No, your Honor, I believe that's it.

14            THE COURT:  All right.  So work that up.  I'll take a

15   five-minute break, and I'll resume the bench.

16            MR. SHEPPARD:  Thank you.

17            THE CLERK:  All rise.  Court is now in recess.

18        (Recess taken.)

19            THE CLERK:  All rise. Court now resumes in session.

20   The Honorable Maria Valdez presiding.  Please be seated and

21   come to order.

22            MR. SU:  Your Honor, while defendant is signing the

23   paperwork, I just want to clarify one thing, which is, I

24   understand your order to mean that she is not allowed to engage

25   in prostitution or fetish activity of any kind, either

1    personally, even outside of, in the room, over the phone, over

2    the internet either -- or directing anyone else to do that on

3    her behalf; is that correct?

4              THE COURT:  I'm sorry, what was the last part?

5              MR. SU:  Or directing anyone else to provide those

6    services on her behalf?

7              THE COURT:  Yes.

8              MR. SHEPPARD:  Judge, may I get a clarification?

9              THE COURT: In other words, get a different line of

10   work at this stage.  And if you win the case, then you go back.

11             MR. SHEPPARD:  Judge, what about being on the

12   telephone with somebody?  Phone sex is legal, so she -- barred

13   from that when there is no -- there can't be an act of

14   prostitution, there can't be touching through a telephone.

15             THE COURT:  What about phone activities?

16             MR. SU:  Your Honor, our position is, given the

17   nature of the investigation, given what we've just discussed

18   today, any sort of involvement in this industry at all is going

19   to lead right back to the provision of illegal activity.

20             THE COURT:  I tend to agree with the government.  No

21   activities of a prurient nature, may I say that much.  So a

22   different line of work altogether.

23             MR. SU:  And, your Honor, may I also ask that your

24   Honor consider a travel restriction to the 2452 West Augusta

25   Boulevard address?

1     MR. SHEPPARD:  Judge, we oppose that.  This is a --

2 she owns this building, and she needs to get in there.  There

3 is a lot of business activities that are totally lawful that

4 she could conduct in there.  And there is -- it's her property.

5     THE COURT:  The travel restriction is granted.  So no

6 travel there.

7     MR. SHEPPARD:  Judge, may she have permission to go

8 into the building to at least organize her affairs?  To simply

9 be barred from the building now from here on in is --

10     THE COURT:  She can go in once to get what she needs

11 to get out.

12     MR. SHEPPARD:  There are five floors in this

13 building, your Honor.

14     THE COURT:  She can go in once, once, to get what she

15 needs to get, and then she can get out.  From what I see from

16 the photos, it's mostly displays and not necessarily business

17 records that would be necessary.

18     Okay.  Anything else?

19     MR. SU:  That's it from the government, Judge.

20     THE COURT:  All right.  Please get the paperwork to

21 the clerk, please, so I can admonish Ms. Nesbitt.  And then we

22 will give you further dates in front of the District Court.

23     MR. SHEPPARD:  Judge, in terms of -- if there is --

24 if one occasion doesn't accomplish what she needs to do to

25 clear out of there, can she get permission from pretrial for a

1    short visit?

2         THE COURT:  No, you'll have to come back to the

3    court.

4         MR. SHEPPARD:  Come back to court?  Okay.

5         THE COURT:  While the paperwork is being reviewed by

6    the court, my courtroom deputy will be giving you further dates

7    in front of the District Court Judge.

8         THE CLERK:  16.18 conference by September 25th.

9    Pretrial motions by October 7th.  Response, by October 17th.

10   Replies by October 24th.  And the status hearing is set for

11   October 15th at 9:30 a.m. before Judge Dow.

12        MR. SHEPPARD:  October 15th?

13        THE CLERK:  Correct, at 9:30 a.m.

14        MR. SHEPPARD:  Thank you.

15        THE CLERK:  You're welcome.

16        THE COURT:  All right.  Ms. Nesbitt, we're going to

17   go over your conditions of release.  I want you to listen very

18   carefully.  You will be released on an unsecured bond in the

19   amount of $250,000.  You will submit to supervision by pretrial

20   services.  You will actively seek employment.  You will

21   surrender any passport you have to pretrial services, and you

22   can have 48 hours to do so.  You will not try to get another

23   passport or any international travel document, and your travel

24   is going to be restricted to the Northern District of Illinois.

25   You will avoid all contact, directly or indirectly, with any

1     persons who may be a victim or witness in this case.  This is

2     including but not limited to all current and former employees

3     and clients -- employees and/or independent contractors.

4                MR. SU:  That's correct.

5                THE COURT:  And clients of Selective Management

6     Enterprises Incorporated, doing business as Kink

7     Extraordinaires.  Do you understand that restriction?  She

8     indicates that she does.

9                You are not to possess a firearm, destructive device

10    or other dangerous weapon.  You are not to use alcohol

11    excessively.  You are not to use or unlawfully possess a

12    narcotic drug or other controlled substance, unless it is

13    prescribed by a licensed medical practitioner.  You will report

14    as soon as possible to pretrial services any contact that you

15    may have with law enforcement while you're out on bond.  You

16    also must surrender your FOID card to pretrial services and

17    transfer any firearms that you have in your possession to a

18    lawfully registered owner and provide confirmation of that

19    transfer within 24 hours.  Do you understand that?  She

20    indicates that she does.

21               You may not engage in prostitution or fetish activity

22    of any kind, either personally or through others.  And you may

23    not go to 2452 West Augusta Boulevard, Chicago, Illinois,

24    except on one occasion.  Do you understand these conditions of

25    release?  Yes?

1          You understand that if you violate any one of these
2    conditions it could result in your bond being revoked and you
3    being placed into federal custody.  Yes?
4          THE DEFENDANT:  Yes.
5          THE COURT:  Do you understand that, if you fail to
6    make a court hearing in which you had been ordered to appear,
7    it could not only result in your bond being revoked but in
8    possibly new charges being filed against you.  Do you
9    understand this?
10          THE DEFENDANT:  Yes.
11          THE COURT:  All right.  I'm holding up what appears
12    to be your signature on the two pieces of paper of the bond.
13    Are those, in fact, your signatures?
14          THE DEFENDANT:  Yes.
15          THE COURT:  She acknowledges her signature on the
16    bond on both sheets.  The court is agreeing to the conditions
17    of release and signing off on the conditions.  And has she been
18    processed by the marshals yet?
19          MR. SHEPPARD:  Yes, your Honor.
20          THE COURT:  She has been?  So there is nothing
21    further --
22          PRETRIAL SERVICES OFFICER:  Your Honor, I believe she
23    would need to go back up to 24th floor.
24          THE COURT:  She will need.  Okay.  So she needs to go
25    back up to the marshals once before she leaves again.  So if

1    she is ordered release after processing?

2           MR. SHEPPARD:  She will -- I will escort her back to

3    24.

4           THE COURT:  I think after bond conditions she has to

5    go back up there to let them know what is going on.

6           All right.  Anything further on behalf of the

7    government?

8           MR. SU:  Your Honor, the government moves to unseal

9    the indictments, as well as to exclude time until October 15th

10   in the interest of justice and to allow for preparation of

11   pretrial motions.

12          THE COURT:  Any objection?

13          MR. SHEPPARD:  No.

14          THE COURT:  All right.  Those motions are granted.

15   Anything further on behalf of Ms. Nesbitt?

16          MR. SHEPPARD:  I'm sorry, your Honor, my client was

17   asking me a question.

18          THE COURT:  Anything further?

19          MR. SU:  That's it, your Honor.

20          MR. SHEPPARD:  No.  Thank you, your Honor.

21          THE COURT:  All right.  Thank you very much.

22          THE CLERK:  All rise.  Court is now adjourned.

23       (Which were all the proceedings heard.)

24

25

1       CERTIFICATE

2           I certify that the foregoing is a correct transcript from

3       the digital recording of proceedings in the above-entitled

4       matter to the best of my ability, given the limitations of

5       using a digital-recording system.

6

7       */s/Sandra M. Mullin*                    January 16, 2020

8       _____          _____
        Sandra M. Mullin                    Date
9       Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25